**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Case No. 07-cv-02598-WJM-BNB

RONNIE WATKINS, surviving spouse,
MADELINE WATKINS,
LANDON WATKINS, and
MICHAELA WATKINS, surviving minor children,
by and through their father Ronnie Watkins,

     Plaintiffs,

v.

ACTION CARE AMBULANCE, INC.,
a Colorado corporation,

     Defendant.

---

## MEMORANDUM REGARDING RULING DURING TRIAL ON COMPARATIVE NEGLIGENCE AFFIRMATIVE DEFENSE

---

At the close of evidence in this case, the parties made what the Court construed as cross-motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on the issue of whether Defendant had satisfied its evidentiary burden with respect to its affirmative defense of comparative negligence.  The Court issued an oral ruling during trial finding that, as a matter of law in this case, comparative negligence was not an appropriate defense.  This Memorandum is intended to supplement the Court's reasoning stated on the record.

## I.  LEGAL STANDARD

Rule 50(a)(1) provides:

> (1) In General.  If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to

find for the party on that issue, the court may: (A) resolve the
issue against the party; and (B) grant a motion for judgment
as a matter of law against the party on a claim or defense
that, under the controlling law, can be maintained or
defeated only with a favorable finding on that issue.

In considering a motion for judgment as a matter of law under Federal Rule of

Civil Procedure 50(a), the Court is required to consider all the evidence presented at

trial, must review the record as a whole, and must draw all reasonable inferences in

favor of the nonmoving party.  "Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a

judge.'" *Reeves v. Sanderson*, 530 U.S. 133, 150 (2000).  The Court may grant the

motion only if the evidence points but one way and is susceptible to no reasonable

inferences which may support the opposing party's position. *Bristol v. Board of County*

*Commissioners of County of Clear Creek*, 281 F.3d 1148, 1161 (10th Cir. 2002).

## II.    FACTUAL BACKGROUND

The Court will briefly recite the facts relevant to resolution of the cross-motions

for judgment as a matter of law.

On July 7, 2007, Mellissa Watkins attempted suicide at her home by ingesting an

excessive amount of her medication.  Her husband, Plaintiff Ronnie Watkins, took her

to the emergency room at Parker Adventist Hospital where she was seen by a physician

and placed on an involuntary mental health hold ("M1 hold").  Because Parker Adventist

did not have an inpatient psychiatric ward, it arranged to have Mrs. Watkins transferred

to Centennial Peaks Mental Health Hospital in Louisville, Colorado.  Defendant Action

Care Ambulance was responsible for transporting Mrs. Watkins between these two

facilities.

Before trial, the parties stipulated to the following:

       H.    When Taunya Jakopec and Christopher Lockwood picked up Mellissa Watkins, they were transporting her from Parker Adventist Hospital located in Parker, Colorado to Centennial Peaks Psychiatric Hospital in Louisville, Colorado.

       I.    Christopher Lockwood was the driver of the ambulance who transported Mellissa Watkins from Parker Adventist Hospital on the way to Centennial Peaks Psychiatric Hospital.

       J.    Taunya Jakopec was the EMT riding in the rear of the ambulance with Mellissa Watkins while they transported Mrs. Watkins to Centennial Peaks Psychiatric Hospital.

       K.    When the agents, servants, and employees of Defendant Action Care picked up Mellissa Watkins, they assumed the responsibility and duty of safely transporting Mellissa Watkins via ambulance.

       L.    The agents, servants, and employees of Defendant Action Care assumed the care and custody of Mellissa Watkins for the purpose of transporting her from Parker Adventist Hospital to Centennial Peaks Psychiatric Hospital.

       M.    The agents, servants and employees of Defendant Action Care were aware that Mrs.Watkins was on a 72 hour mental health hold and had previously attempted suicide.

       N.    Prior to the transport of Mrs. Watkins on July 8, 2007, Ms. Jakopec was provided a copy of a portion of Mrs. Watkins' emergency room hospital chart, which included the documented notes of Bonnie Mucklow and the mental health hold order signed by the emergency room.

       O.    Prior to Mellissa Watkins being transported on July 8, 2007, Ms. Jakopec reviewed the mental health hold order and was aware of the following:

       a.    A licensed physician had determined that Mellissa Watkins was suffering a mental illness and

presented an imminent danger to herself;

      b.    Mellissa Watkins had been taken into custody and placed on an involuntary 72 hour mental health hold;

      c.    Mellissa Watkins had recently been hospitalized at Highlands Behavioral Center, a mental hospital, in 3 admissions;

      d.    Mellissa Watkins had attempted suicide the day before, July 7, 2007, and had a history of multiple suicide attempts before that.

P.    At the Parker Adventist Hospital, prior to the transport of Mrs. Watkins, Mr. Lockwood and Ms. Jakopec were told by a nurse that Mrs. Watkins had a history of mental issues, including suicidal ideations and several suicide attempts.

Q.    While transporting Mellissa Watkins, Taunya Jakopec and Christopher Lockwood traveled from Parker, Colorado on E-470 and then merged onto Interstate 25 heading Northbound.

R.    At the time of the transport of Mrs. Watkins on July 8, 2007, Ms. Jakopec's duty included protecting Mrs. Watkins from herself.

S.    While Mellissa Watkins was in the ambulance, she kept looking out the back window of the ambulance for her husband's truck.

T.    While Mellissa Watkins was being transported via ambulance she requested that the driver slow down so that she could see her husband.

U.    Taunya Jakopec originally seated herself on the bench seat physically next to patient Mellissa Watkins, and then physically moved to a "Captain's Chair" located behind the head of the gurney.

V.    After Ms. Jakopec moved to the "captain's chair" from the side bench, she could not see Mrs. Watkins's hands nor could she see the safety belt buckle on the waist belt on Mrs. Watkins.

W.    Taunya Jakopec moved to the "Captain's Chair" to give Mellissa Watkins "space" and "privacy" as the patient stated that she did not want to talk anymore, Mellissa Watkins did not ask Jakopec to move from the side bench.

X.    The shoulder harness type safety restraints were present in the ambulance, but were not utilized on Mellissa Watkins.

Y.    Mellissa Watkins was strapped with one strap over her ankles and one strap over her waist.

Z.    Both straps had a buckle identical to those used for passengers on commercial airlines.

AA.    Mellissa Watkins kept repeating comments to the ambulance personnel about her husband and his location behind them.

BB.    Mellissa Watkins got up from the gurney, opened the rear door of the ambulance.

CC.    The rear doors of the ambulance at all times material hereto were not locked.

DD.    The rear doors of ambulance Unit 111, at the time of this transport, did not lock automatically when the vehicle was in motion.

EE.    Mellissa Watkins died on July 8, 2007.

(Stipulated Facts.)  At trial, the parties stipulated that Mellissa Watkins intentionally jumped from Defendant's ambulance during her transport on July 8, 2007.

## III.    PROCEDURAL HISTORY

In its answer to Plaintiffs' amended complaint in this case, Defendant asserted the defense of comparative negligence.  Defendant submitted proposed jury instructions on comparative negligence and a verdict form that contemplated the jury weighing any negligence on the part of Defendant against Mrs. Watkins's negligence.

Plaintiffs objected to Defendant's proposed instruction arguing that Mrs. Watkins could not be negligent because she was on a mental health hold.  Because these important legal issues had never been briefed by the parties, the Court ordered mid-trial briefing from the parties on the following:

1.     During trial, the parties stipulated to the fact that Melissa Watkins intentionally jumped from the ambulance.  Because intentional acts cannot be considered negligent, can Mrs. Watkins's jump from the ambulance be considered by the jury in weighing comparative negligence?  If the jump from the ambulance cannot be considered negligent, can the jury consider the act of jumping in allocating fault?  Does Colorado law distinguish between comparative fault and comparative negligence in the wrongful death realm?

2.     In general, under Colorado law, an individual has a "duty to protect oneself from unreasonable risk, and to act as a reasonably prudent person." *Dillion Companies, Inc. v. Hussman Corp.*, 163 F. App'x 749, 754 (10th Cir. 2006) (quoting *Powell v. City of Ouray*, 507 P.2d 1101, 1105 (Colo. App. 1973)).  Was Melissa Watkins's duty to protect herself and act as a reasonably prudent person affected by the fact that she was on a mental health (M1) hold at the time she jumped from the ambulance?  If the M1 hold relieved Melissa Watkins of the duty to protect herself, can the jury consider her jump from the ambulance in its determination of comparative negligence?

3.     Are any of the issues raised above those that can (or should) be resolved by the Court before the case goes to the jury?  Or are these all questions of fact that the jury must decide?

6

These briefs were intended to assist the Court in preparation of the jury instructions and verdict form.

At the close of evidence in this case, the parties made cross-motions for judgment as a matter of law pursuant to Rule 50(a).  Plaintiffs asked the Court to rule that, as a matter of law, Mrs. Watkins could not be liable for her own actions and, therefore, comparative negligence was not an appropriate defense.  Defendant asked the Court to rule that, as a matter of law, Plaintiffs' stipulation to the fact that Mrs. Watkins intentionally jumped from the ambulance was an admission of fault as well as an admission that she caused at least a portion of Plaintiffs' damages.  Defendant asked the Court to instruct the jury that Mrs. Watkins's actions were a cause of the Plaintiffs' damages and that Mrs. Watkins was at least partially at fault, and to leave the issue of percentage of fault to the jury.

For the reasons set forth on the record and supplemented below, the Court ruled as matter of law that comparative negligence was not an appropriate defense

## IV.   **ANALYSIS**

With respect to its comparative negligence defense, Defendant was required to produce evidence sufficient to allow a jury to find the following:

1.     Mrs. Watkins had a duty to protect herself;

2.     There was a breach of that duty;

3.     Such breach was a proximate cause of Plaintiffs' injuries.

*Hesse v. McClintic*, 176 P.3d 759, 762 n.3 (Colo. 2008) ("Whereas negligence law imposes a duty on the defendant to not subject the plaintiff to an unreasonable risk of harm, comparative negligence imposes on the plaintiff who has been harmed a duty to

7

the defendant to protect herself and minimize the harm she suffers."); *Dillon Companies, Inc. v. Hussman Corp.*, 163 F. App'x 749, 754 (10th Cir. 2006) ("In cases where comparative negligence applies, the plaintiff has a duty to protect oneself from unreasonable risk, and to act as a reasonably prudent person.").

In this case, the only prong at issue is whether Mrs. Watkins had a duty to protect herself at the time she jumped from the ambulance.  Defendant presented sufficient evidence to meet its burden with respect to the second and third prong of its comparative negligence claim.  The parties stipulated that Mrs. Watkins intentionally jumped from the ambulance, which would be a breach of her duty to protect herself if such duty existed.  It is also undisputed that Mrs. Watkins died as a result of her jump from the ambulance and that her death was a proximate cause of Plaintiffs' injuries.

Therefore, the salient issue with respect to the parties' cross-motions for judgment as a matter of law was whether Mrs. Watkins had a duty to protect herself at the time she jumped from the ambulance.  The existence and scope of a duty is a matter of law to be decided by the Court rather than left to a jury.  *Hesse v. McClintic*, 176 P.3d 759, 762 (Colo. 2008); *White v. Pines Enterprises, Inc.*, 728 P.2d 759, 760 (Colo. App. 1986).

In general, an individual has a duty to protect oneself from unreasonable risk and to act as a reasonably prudent person.  *Powell v. City of Ouray*, 507 P.2d 1101, 1105 (Colo. App. 1973).  However, it is undisputed that at the time Mrs. Watkins jumped from the ambulance, she was on an involuntary mental health hold as a result of her suicide attempt the day before.  At the time of her jump from the ambulance, she was being transported from an emergency room to an in-patient psychiatric treatment program.

Plaintiffs argue that Mrs. Watkins's mental condition abrogated her duty to protect herself and/or that Defendant assumed her duty to protect herself when it took custody of her for the purpose of transport.

The Court has been unable to locate any Colorado case law discussing the extent of a medical entity's duty to a protect a patient from self-harm when that individual is at the facility as a result of an involuntary mental health hold.   Defendant argues that this question is governed by *Sheron v. Lutheran Medical Center*, 18 P.3d 796 (Colo. App. 2000).  The Court has reviewed *Sheron* and finds it distinguishable because, as Plaintiffs note, the decedent in *Sheron* was not in Defendant's custody at the time he committed suicide.  Rather, he had been treated at Defendant's facility and released the day before he committed suicide.  It is undisputed that Mrs. Watkins was in Defendant's custody when she took her own life.  (Stipulated Fact ¶ L.)  Based on this significant factual distinction, the Court finds *Sheron* unpersuasive.  Because the Court was unable to locate controlling Colorado law, the Court looked to case law outside of Colorado to arrive at its conclusion.

In "Fault and the Suicide Victim: When Third Parties Assume a Suicide Victim's Duty of Self-Care," 76 Neb. L. Rev. 301 (1997), author Charles J. Williams surveys the case law on this issue and notes:

> Many courts have been presented with the issue of whether a third person at some point assumed the duty of self-care that a suicide victim owed to himself. Suicides at hospitals or psychiatric facilities are frequent sources of these cases. Most courts that have directly addressed this type of case have held that when hospitals admit known suicidal patients, hospitals assume the duty that patients normally would owe to themselves to refrain from taking actions that could harm them.

*Id*. at 305-06.  The two key facts that appear to drive the determination of whether a defendant has assumed a duty to protect an individual from self-harm are: (1) whether the defendant exercised custody and control over the suicide victim; and (2) whether the defendant knew or had reason to know that the suicide victim was a danger to herself.

In this case, both prongs are satisfied.  Defendant has stipulated to the fact that it "assumed the care <u>and custody</u> of Mellissa Watkins for the purpose of transporting her from Parker Adventist Hospital to Centennial Peaks Psychiatric Hospital." (Stipulated Fact ¶ L) (emphasis added).  Defendant has also stipulated that, at the time it assumed custody of Mrs. Watkins, it knew that Mrs. Watkins was on a 72 hour mental health hold, that Mrs. Watkins had previously been admitted three times to Highlands Behavioral Health Center, had attempted to commit suicide the prior day, and had multiple prior suicide attempts.  (Stipulated Facts ¶¶ M & N.)

"[W]hen a defendant does not have the suicide victim effectively within his custody or control, the defendant may compare the victim's fault against the defendant's own negligence.  Likewise, juries can compare the patient's fault against the defendant's fault when there is insufficient evidence that the defendant was aware of the person's suicidal tendencies."  Williams, *supra* at 309.  However, when both prongs are satisfied, this Court's research reveals that other courts have typically not allowed a defense of comparative negligence.  *See Gregoire v. City of Oak Harbor*, 244 P.3d 924, 931 (Wash. 2010); *Saunders v. County of Steuben*, 693 N.E.2d 16, 20 (Ind. 1998); *Bramlette v. Charter Medical Columbia*, 393 S.E.2d 914, 917 (S.C. 1990);

10

*McNamara v. Honeyman*, 546 N.E.2d 139, 146-47 (Mass. 1989); *Cowan v. Doering*,

545 A.2d 159, 162 (N.J. 1988).

In *McNamara v. Honeyman*, 546 N.E.2d 139, 146-47 (Mass. 1989), the

Massachusetts Supreme Court held:

> We join a number of courts in holding there can be no
> comparative negligence where the defendant's duty of care
> includes preventing the self-abusive or self-destructive acts
> that caused the plaintiff's injury.  Clearly, the duty of care
> that the defendants owed to an institutionalized patient such
> as [the plaintiff] included taking reasonable steps to prevent
> her suicide when it was a known or foreseeable risk. To
> allow the defense of comparative negligence in these
> circumstances would render meaningless the duty of the
> hospital to act reasonably in protecting the patient against
> self-harm.

In *Tomfohr v. Mayo Foundation*, 450 N.W.2d 121, 125 (Minn. 1990), where a

patient committed suicide in his room at a psychiatric hospital, the court stated:

> When the jury has been asked, as it was here, to determine
> whether the suicide attempt was reasonably foreseeable,
> given the circumstances surrounding the patient's admission
> and his mental state, it is not only unnecessary but also
> duplicative to again review the patient's conduct to
> determine whether the patient's volitional act requires the
> application of comparative fault. In this specific type of case,
> the mental condition of the patient exists prior to the
> hospital's negligent act, and it is that condition which gives
> rise to the hospital's duty of care and which defines the
> scope of that duty.

The New Jersey Court of Appeals held in *Cowan v. Doering*, 522 A.2d 444, 449

(N.J. App. 1987):

> [A] patient known to harbor suicidal tendencies whose
> judgment has been blunted by a mental disability should not
> have his conduct measured by external standards applicable
> to a normal adult.  Where it is reasonably foreseeable that a
> patient by reason of his mental condition or emotional illness

> may attempt to injure himself, those in charge of his care
> owe a duty to safeguard him from his self-damaging
> potential.  This duty contemplates the reasonably
> foreseeable occurrence of self-inflicted injury regardless of
> whether it is the product of the patient's volitional or
> negligent act.

The Court agrees with the reasoning of these courts.  Applied to this case, it is clear that as a matter of law, Defendant had assumed Mrs. Watkins duty of self-care at the time she jumped from the ambulance.  Defendant has conceded that it had custody of Mrs. Watkins for the 45-50 minutes it would have taken to transport her to Centennial Peaks.  Based on the custodial relationship, it owed Mrs. Watkins a duty to take reasonable steps to care for her and to transport her safely.  Because Defendant was aware that Mrs. Watkins was on a mental health hold, had a history of suicide attempts, including on the day before, its duty to Mrs. Watkins included the duty to reasonably protect her from self-harm.  *See Cowan*, 545 A.2d at 163.  In fact, Defendant has stipulated that part of its duty "included protecting Mrs. Watkins from herself." (Stipulated Fact ¶ R.)  To allow the defense of comparative negligence in these circumstances would render legally meaningless Defendant's duty to act reasonably in protecting Mrs. Watkins against self-harm.  *McNamara*, 546 N.E.2d at 146; *see also Bramlette*, 393 S.E.2d at 917 (holding that where a medical facility has a duty to prevent a suicidal patient from committing suicide "clearly the very act which the defendant has a duty to prevent cannot constitute contributory negligence or assumption of the risk as a matter of law.").

Based on the undisputed facts in this case, and the above-cited case law, the Court concluded that in these narrow circumstances Mrs. Watkins did not owe a duty of

12

care to protect herself at the time she jumped from the ambulance.  Rather, by assuming custody of Mrs. Watkins with knowledge that she was on a mental health hold and had a recent history of suicide attempts, Defendant assumed Mrs. Watkins's duty of self-care.

In Colorado, it is error to instruct the jury on comparative negligence where the plaintiff does not have a duty to exercise care.  *Wark v. McClellan*, 68 P.3d 574, 580-81 (Colo. App. 2003).  Because the Court found that Mrs. Watkins's duty to reasonably protect herself was assumed by Defendant, the Court did not instruct the jury on comparative negligence.

However, the Court's ruling on comparative negligence did not make the fact that Mrs. Watkins intentionally jumped from the ambulance irrelevant.  The Court instructed the jury that the legal definition of the term "cause" includes a proximate cause requirement.  Specifically, the Court instructed the jury that Defendant's negligence did not cause Plaintiffs' injuries unless "unless injury to a person in Decedent's situation was a reasonably foreseeable result of that negligence."  Thus, the jury had the opportunity to consider Mrs. Watkins's actions in making its proximate cause determination.  *See Cowan*, 545 A.2d at 465 (jury permitted to consider foreseeability of decedent's actions in determining proximate cause).

## V.    CONCLUSION

For the reasons set forth on the record and above, Defendant's Rule 50 Motion requesting that the Court find, as a matter of law, that Mrs. Watkins's intentional jump from the ambulance was negligent and a cause of Plaintiffs' injuries was DENIED. Plaintiffs' cross-motion asking the Court to find that comparative negligence was not an

appropriate affirmative defense was GRANTED.  The Court did not instruct the jury with respect to comparative negligence and the Court's verdict form did not allow the jury to apportion negligence to Mrs. Watkins.

Dated this 5th day of October, 2011.

BY THE COURT:

William J. Martínez
United States District Judge